UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

RACHEL LOUISE MILLER and
AYANA JONES,
          Plaintiffs,

v.

                                     CIVIL ACTION NO. 5:23-cv-00453

UNITED STATES OF AMERICA,

          Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

Pending is Defendant the United States of America's Motion to Dismiss [Doc. 11], filed October 12, 2023.[1] Plaintiffs Rachel Louise Miller and Ayana Jones responded to the United States' motion on November 13, 2023 [Doc. 17], to which the United States replied on November 20, 2023 [Doc. 18]. This matter is ready for adjudication.

**I.**

In 2021, Plaintiffs, two 100% totally and permanently disabled veterans, sought dental care and treatment at the Beckley Veterans Affairs Medical Center ("BVAMC"). [Doc. 6 at 2–3 ¶ 8]. Then-acting Chief of Dentistry, Dr. Blake Younis, DDS, allegedly denied Plaintiffs the care they sought. [*Id.*]. Plaintiffs then sought help from BVAMC Director Desmond J. McMullan's office but were told Director McMullan would only "act if there was a 'Political Inquiry.'" [*Id.* at 3 ¶ 9].

---

[1] On November 16, 2023, the parties jointly moved to amend the briefing schedule to allow Plaintiffs to respond to the United States' Motion to Dismiss by November 13, 2023, and to allow the United States to reply by November 28, 2023 [Doc. 16]. For good cause shown, the Court **GRANTS** the Motion.

Plaintiffs continued to seek help from others at BVAMC. [*Id.*]. Eventually, Chaplain Mark Jobst submitted an "Ethics Consult" on their behalf. [*Id.*]. Plaintiffs allege when they arrived at BVAMC on Monday, August 30, 2021, for their scheduled "Ethics Committee meeting," they were met by police who were "aggressive, argumentative, and ready to pounce." [*Id.* at 3 ¶ 10]. Chaplain Jobst, however, came outside and verified that Plaintiffs had a committee meeting to attend. [*Id.*].

Ethics Committee member Portia Parker, a Social Worker employed at BVAMC, attended the meeting. [*Id.* at 3 ¶ 11]. Plaintiffs allege during the meeting Ms. Parker informed them the Committee had found in Plaintiffs' favor and recommended to Director McMullan the dental care Plaintiffs sought be provided pursuant to their veterans' benefits entitlements. [*Id.*]. Plaintiffs allegedly continued to be denied dental care, despite the Ethics Committee's recommendation.

On September 9, 2021, Ms. Parker suggested Plaintiffs "transfer their care to avoid retaliation, harassment, continued racial/gender discrimination, and open blatant hostility." [*Id.* at 11 ¶ 53]. Thereafter, on September 21, 2021, Plaintiffs drove to the Hershel "Woody" Williams Veterans Affairs Medical Center ("HVAMC") in Huntington to be examined by Chief of Dentistry Dr. Michael Joseph, DDS. [*Id.* at 4 ¶14]. Dr. Joseph diagnosed Ms. Miller with Stage 1 Periodontal Disease, several cavities, three broken teeth, and two failing crowns. [*Id.* at 4 ¶ 15].

Immediately following Ms. Miller's exam, both Plaintiffs transferred their dental care from BVAMC to HVAMC. [*Id.* at 4 ¶ 16]. On October 13, 2021, Ms. Jones was seen at HVAMC and was approved for seven dental implants, three of which were for teeth she allegedly lost during the time she sought and was denied dental care at BVAMC. [*Id.* at 4 ¶ 17]. Ms. Miller also subsequently "had three teeth extracted because of large cavities that could not be repaired to save the teeth due to the passage of time waiting for dental care." [*Id.* at 4 ¶ 18].

2

Plaintiffs proceeded to file complaints with the United States Department of Veterans Affairs ("VA") Office of Inspector General and the West Virginia Board of Dentistry ("the Board"), alleging medical malpractice against Dr. Younis. [*Id.* at 3 ¶ 13]. Plaintiffs filed with their complaints a signed release authorizing access to Plaintiffs' medical records, "for official use by the West Virginia Board of Dentistry, its agents and representatives, in the course of investigating possible violations of the laws of West Virginia, and any administrative proceedings relating thereto." [Doc. 6-7 at 2; Doc. 6-8 at 2].

The law firm of Shuman McCuskey Slicer PLLC (hereinafter, "the law firm") defended Dr. Younis. [Doc. 6 at 4 ¶ 21]. On October 26, 2021, the law firm requested Plaintiffs dental records from the Veterans Affairs Beckley Health Care System ("VABHCS"). [Doc. 6-7 at 3]. The letter was not accompanied by a signed authorization from Plaintiffs, a court order, or a subpoena. [*Id.*].

VABHCS searched its records for any of Plaintiffs' medical records containing the word "dental." [Doc. 6 at 9 ¶¶ 41–43]. On October 28, 2021, VABHCS released Plaintiffs' medical records to the law firm. [Doc. 6-7 at 3]. The release included not only Plaintiffs' dental records, but several extraneous records, such as mental health records, containing the word "dental." [Doc. 6 at 9 ¶¶ 41–43].

On or around December 4, 2021, Plaintiffs received Dr. Younis's response to their complaints filed with the Board. [*Id.* at 5 ¶ 22]. Dr. Younis's response included statements like (1) "I have now been provided with a full set of records (including Mental Health Records)," (2) "I have learned that Rachel Miller has had many disruptive behavior reports filed upon her for being hostile and aggressive," and (3) "Ms. Miller's mental health providers have filed reports on her as well." These statements alerted Plaintiffs that Dr. Younis and her attorneys possessed their mental

health records. [*Id.* at 5 ¶¶ 23–25]. This discovery prompted Plaintiffs to file a request with BVAMC Privacy Officer Jennifer Treadway for a Sensitive Patient Access Report ("SPAR"). [*Id.* at 5 ¶ 27]. On January 6, 2022, Ms. Miller received her SPAR, which revealed Dr. Younis accessed her BVAMC patient chart on November 24, 2021, and November 29, 2021. [Doc. 6-7 at 3]. On February 12, 2022, Ms. Jones received her SPAR, which showed Dr. Younis had accessed her BVAMC patient chart on several occasions throughout October and November 2021. [Doc. 6-8 at 3].

Around that time, Plaintiffs also contacted Rebecca Weaver at the VA Office of General Counsel to report the putative Health Insurance Portability and Accountability Act of 1996 ("HIPAA") violations and to request their SPARs be added to Plaintiffs' pending cases. [Doc. 6 at 6 ¶ 28]. Ms. Weaver informed Plaintiffs they could not amend their previously filed administrative tort claims and would both need to file new claims for the alleged HIPAA violations. [*Id.* at 6 ¶ 29]. Ms. Weaver then connected Plaintiffs with the VA's Risk Manager, Andrea Cox; Ms. Cox allegedly told Plaintiffs they could not file a tort claim for HIPAA violations. [*Id.*].

## A.    *OCR Complaints*

On or around January 13, 2022, Plaintiffs filed complaints with the United States Department of Health and Human Services ("HHS"), Office for Civil Rights ("OCR"), alleging BVAMC impermissibly disclosed their protected health information to the law firm without a court order or subpoena and without authorization or notification, in violation of HIPAA. [Doc. 6 at 8 ¶ 37].

On or around February 5, 2022, Plaintiffs received HIPAA notification letters from BVAMC, informing them their records had been mistakenly sent to the law firm. [Doc. 6 at 8 ¶ 39;

4

Doc. 6-7 at 4; Doc. 6-8 at 4].  The notification letters identified the date of disclosure, the types of protected health information impermissibly disclosed, and steps Plaintiffs could take to protect themselves. [Doc. 6-7 at 4; Doc. 6-8 at 4].

In its response to OCR's Data Request, VABHCS reported that on February 16, 2022, its Privacy Officer informed the law firm that Plaintiffs' mental health records were sent in error and the law firm needed to return the records for proper destruction. [Doc. 6-7 at 4; Doc. 6-8 at 4]. On March 3, 2022, the law firm returned the records to the Privacy Officer, and the records were subsequently destroyed in compliance with the VA's data destruction requirements. [Doc. 6-7 at 4; Doc. 6-8 at 4].

On May 25, 2023, OCR notified Plaintiffs it had completed its review and issued its findings and conclusion. [Doc. 6 at 8 ¶ 37; Docs. 6-7, 6-8]. OCR determined the release of Plaintiffs' records to the law firm "was not permitted under the Privacy Rule and therefore the disclosure was a breach." [Doc. 6-7 at 11; Doc. 6-8 at 11]. OCR further concluded Dr. Younis's access of Plaintiffs' patient charts in October and November 2021 "was not permitted under the Privacy [Rule] and therefore is also a breach." [Doc. 6-7 at 11; Doc. 6-8 at 11]. In reaching its decision, OCR noted that while Plaintiffs' "signed an authorization that appears valid, albeit somewhat broad," when they filed their complaints with the Board, the authorization only applied to, "[the Board], its agents and representatives," and did not include the law firm. [Doc. 6-7 at 11; Doc. 6-8 at 11].

## B.    *General Counsel Complaints*

On or around March 14, 2022, Plaintiffs submitted identical Standard Form 95s to the VA Office of General Counsel, each describing the basis of their claims as follows:

My Privacy and HIPAA Rights have been deliberately violated by the Beckley,

West Virginia VA Medical Center. They intentionally released my private data and information to allow a federal employee a chance to save her license as a Dentist. The retaliation and malicious act of Violated [sic] all Federa[l], State, VA Privacy laws and Statutes. (Please see attached for clarity)[.]

[Doc. 11-1 at 2, 4–5, 60–61].[2] Attached to each Standard Form 95 is a document titled "Tort Complaint for Intentional Data Breach of Sensitive Personal Data" listing the "alleged violations performed by the Beckley VA Administration upper management" as follows: (1) "Intentional Theft of Unsecured Sensitive Personal [D]ata," (2) "Breach of Privacy Contract," *3) "Theft of Data," and (4) "Data Breach." [*Id.* at 42–47, 100–05].

On September 12, 2022, the VA notified Plaintiffs it had denied their claims. [Doc. 6-13 at 1]. The VA explained "the [Federal Torts Claim Act ("FTCA"), 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), and 2671–80,] provides a remedy only where there is a violation of a tort duty imposed by State law. Because [HIPAA] is a Federal statute, it imposes no State law duty, and there is, therefore, no remedy under FTCA for a HIPAA violation." [*Id.*]. Likewise, the VA noted, "to the extent [Plaintiffs alleged] a violation under the Federal Privacy Act, there is no remedy under [the] FTCA for a Federal Privacy Act violation." [*Id.*] Additionally, the VA concluded, "there was no negligent or wrongful act on the part of an employee of the [VA] acting within the scope of employment that caused compensable harm." [*Id.*].

---

[2] Although matters beyond the Amended Complaint's allegations may not be considered in a motion to dismiss pursuant to Rule 12(b)(6), our Court of Appeals has made clear that an attachment to a motion to dismiss may be considered if the document "was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Plaintiffs attached several documents to the Amended Complaint which are integral to, explicitly relied upon -- and, indeed, quoted in part -- in the Amended Complaint. Defendants attached many of the same documents to their motion to dismiss. Defendants also attached Plaintiffs' Standard Form 95s, which are integral to and explicitly relied upon in the Amended Complaint. The parties do not contest the authenticity of any of the documents. It is thus appropriate to consider those documents in deciding Defendant's motion to dismiss.

6

On December 3, 2022, Plaintiffs submitted an "Administrative Request for Reconsideration," which included newly discovered information and Plaintiffs' attempt to "clarify and amend [Plaintiffs' Standard Form 95] Basis for Tort Claim" by listing the following bases for relief: (1) "Intentional Theft of Unsecured Sensitive Personal [D]ata," (2) "Breach of Privacy Contract," (3) "Theft of Data," (4) "Data Breach," (5) "Violation in the [D]uty of [C]onfidentiality," (6) "Intentional Data Breach," (7) "Willful Neglect of HIPAA . . .," (8) "Fraud," (9) "Conspiracy to [C]ommit Fraud," and (10) "Violation of Public Trust." [Doc. 11-1 at 119–20]. On January 10, 2023, the VA acknowledged receipt of Plaintiffs' request for reconsideration. [Doc. 6 at 12 ¶ 60]. On May 30, 2023, Plaintiff notified the VA of OCR's findings and conclusion. [*Id.* at 13 ¶ 64[3]].

---

[3] The relevant regulations provide,

[I]f the claimant is dissatisfied with the agency['s final denial of his administrative claim], he may file suit in an appropriate U.S. District Court not later than 6 months after the date of mailing of the notification. . . . Prior to the commencement of suit and prior to the expiration of the 6-month period provided in 28 U.S.C. 2401(b), a claimant . . . may file a written request with the agency for reconsideration of a final denial of a claim . . . . Upon the timely filing of a request for reconsideration the agency shall have 6 months from the date of filing in which to make a final disposition of the claim and the claimant's option under 28 U.S.C. 2675(a) shall not accrue until 6 months after the filing of a request for reconsideration.

28 C.F.R. § 14.9(a)–(b).

28 U.S.C. 2675(a) states, "The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section." At the time Plaintiffs filed the Amended Complaint on August 11, 2023, the VA had not yet issued a decision on Plaintiffs' request for reconsideration. Accordingly, by filing the instant action, Plaintiffs have exercised their statutory right to deem the VA's inaction on their request for reconsideration "a final denial of the claim" pursuant to 28 U.S.C. 2675(a).

*C.*      ***The Instant Action***

On June 26, 2023, Plaintiffs instituted this action against the United States by filing a combined pro se complaint. [Doc. 1]. Plaintiffs then retained legal counsel, on August 11, 2023, and filed the operative Amended Complaint [Doc. 6]. The claims in the Amended Complaint are as follows: Count I – Wrongful Release of Medical Records and Mental Health Records; Count II – Retaliation; Count III – Intentional/Negligent Infliction of Emotional Distress; Count IV – Negligent Supervision; Count V – Negligent Training[4]; and Count VI – Negligent Hiring. [*Id.* at 13–20 ¶¶ 65–100]. Plaintiffs request damages for physical pain and suffering, mental and emotional anguish, medical expenses, and loss of enjoyment of life. [*Id.* at 20 ¶ 102].

On October 12, 2023, the United States moved to dismiss the Amended Complaint [Doc. 11]. The United States contends Count I must be dismissed inasmuch as Plaintiffs failed to allege a cognizable federal or state prima facie claim for the wrongful disclosure of medical records. [*Id.* at 2]. The United States further asserts the remaining counts must be dismissed for failure to exhaust administrative remedies. [*Id.*].

## II.

*Federal Rule of Civil Procedure* 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief." Fed. R. Civ. P. 8(a)(2); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P.

---

[4] Although both Counts IV and V of the Amended Complaint are titled "Negligent Supervision," the paragraphs alleged in support of each cause of action suggests Count V was intended to be titled "Negligent Training." [Doc. 6 at 19–20 ¶¶ 89–96].

12(b)(6). Any defense presented under Rule 12(b)(6) "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Thus, the motion to dismiss must be filed before any answer to the complaint is filed. Additionally, and as an aside, any answer must be filed within twenty-one days of the issuance of the summons, except for situations wherein that timeline is enlarged by the court. Fed. R. Civ. P. 12(a).

The required "short and plain statement" must provide "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted); *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015). Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions." *Twombly*, 550 U.S. at 555. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." *Id.*; *McCleary-Evans*, 780 F.3d at 585; *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020), *cert. denied*, 209 L. Ed. 2d 122, 141 S. Ct. 1376 (2021); *Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008).

The complaint need not "forecast evidence sufficient to prove the elements of [a] claim," but it must "allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 291 (4th Cir. 2012)) (internal quotation marks omitted). Stated another way, the operative pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting the opening pleading "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In sum, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570;

9

*Robertson*, 679 F.3d at 288.

The decision in *Iqbal* provides some additional markers concerning the plausibility

requirement:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief. . . .'"

> Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 556 U.S. at 678–79 (citations omitted).

As noted in *Iqbal*, the Supreme Court has consistently interpreted the Rule 12(b)(6)

standard to require a court to "accept as true all of the factual allegations contained in the

complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see*

*also S.C. Dep't of Health & Env't Control v. Com. & Indus. Ins. Co.*, 372 F.3d 245, 255 (4th Cir.

2004) (citing *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002)). The court is required to "draw[]

all reasonable . . . inferences from those facts in the plaintiff's favor." *Edwards v. City of*

*Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

# III.

## A.      *Count I – Wrongful Release of Medical Records and Mental Health Records*

Count I asserts a claim for "Wrongful Release of Medical Records and Mental Health Records" based in part on alleged violations of federal regulations implementing HIPAA. [Doc. 6 at 13–15 ¶¶ 65–76]. Specifically, Plaintiffs cite 45 C.F.R. §§ 164.308(a) and 164.502(b), which prohibit covered entities from disclosing protected health information, except as permitted or required by federal law.  [*Id.* at 14 ¶¶ 69–70]. It is well-established that "HIPAA does not create a private right of action." *Payne v. Taslimi*, 998 F.3d 648, 653 (4th Cir. 2021); *see also Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 n.4 (10th Cir. 2010); *Webb v. Smart Document Sols., LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007); *Acara v. Banks*, 470 F.3d 569 (5th Cir. 2006) (citing numerous federal district court cases holding there is no private right of action under HIPAA).

Conceding HIPAA does not provide a private right of action, Plaintiffs contend their claims are not based on HIPAA but instead are based on alleged violations of the federal Privacy Act, 5 U.S.C. § 552a. [Doc. No. 17 at 3–4 (citing 45 C.F.R. §5b.9(a))]. However, the FTCA waives the United States' sovereign immunity only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the *law of the place* where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added). The Supreme Court has "consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State -- the source of substantive liability under the FTCA." *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994). A federal agent's failure to act in accordance with obligations imposed upon him solely by federal statute cannot stand alone as the basis for suit under the FTCA. *See Williamson v. United States*, 242 F.3d 169, 173 (4th Cir. 2001) ("[T]he FTCA does not waive the United States'

11

immunity against liability for violation of its own statutes . . . .") (first citing *FDIC v. Meyer*, 510 U.S. 471, 478 (1994) ("Indeed, we have consistently held that § 1346(b)'s reference to the 'law of the place' means the law of the State—the source of substantive liability under the FTCA."); then citing *United States v. Agronics Inc.*, 164 F.3d 1343, 1346 (10th Cir. 1999) ("The underlying principle is that the FTCA's waiver of sovereign immunity is limited to conduct for which a private person could be held liable under state tort law," not federal statutory law); and then citing *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 536 (1st Cir. 1997) (holding "violation of a federal statute by governmental actors does not create liability unless state law would impose liability on a 'private individual under like circumstances'")). Therefore, alleged violations of the federal Privacy Act cannot alone serve as the basis for an FTCA claim. *See Coleman v. United States*, 912 F.3d 824, 835 (5th Cir. 2019) ("[A]lleged violations of the federal Privacy Act cannot be the basis for FTCA claims.").

Nevertheless, a state statute under which a duty arises, or a federal law with an analogous state law tort, may save the claim if properly pled. *See Harvey v. United States*, No. 3:22cv169, 2022 WL 17405826, at *7 (E.D. Va. Dec. 2, 2022) (dismissing plaintiff's FTCA claim and holding "both the common-law and statutory based avenues to bring a private wrongful disclosure of confidential medical records claim are foreclosed" under federal and Virginia law), *aff'd per curiam*, No. 23-1077, 2023 WL 3598614, at *1 (4th Cir. May 23, 2023). The Supreme Court of Appeals of West Virginia has long recognized a private tort claim for the "unauthorized release of a patient's medical records" in violation of *West Virginia Code* section 27-3-1. Syl. Pt. 1, *Allen v. Smith*, 179 W. Va. 360, 360, 368 S.E.2d 924, 924 (1988). West Virginia "[c]ommon-law tort claims based upon the wrongful disclosure of medical or personal health information are not preempted by [HIPAA]." Syl. Pt. 15, *Barber v. Camden Clark Mem'l Hosp. Corp.*, 240 W.

Va. 663, 665, 815 S.E.2d 474, 483 (2018) (internal quotation marks omitted).

The United States contends such claims necessarily fall under the provisions of the Medical Professional Liability Act ("MPLA") because "'a privacy claim . . . based upon unauthorized disclosure of medical information . . . would be contemporaneous and related to the anchor claim' of medical negligence." [Doc. 11 at 5 (quoting *State ex rel. Charleston Area Med. Ctr., Inc. v. Thompson*, 248 W. Va. 352, 361, 888 S.E.2d 852, 861 (W. Va. 2023)]. Per the text of the statute, the MPLA "applies only when two conditions are satisfied, that is, when a plaintiff (1) sues a 'health care provider' or 'health care facility' for (2) 'medical professional liability' as those terms are defined under the [MPLA]." *State ex rel. W. Va. Div. of Corr. & Rehab. v. Ferguson*, 248 W. Va. 471, 480, 889 S.E.2d 44, 53 (2023). When those conditions are present, the action must be brought under the MPLA, even if another cause of action would otherwise apply. *See*, *e.g.*, *Minnich v. MedExpress Urgent Care, Inc.*, 238 W. Va. 533, 796 S.E.2d 642, 646 (2017).

Inasmuch as the parties make no contention concerning whether the United States qualifies as a health care provider, the Court first examines the second prong, namely, whether Plaintiffs have sued the United States for "medical professional liability" as defined under the MPLA. The MPLA defines "medical professional liability," as follows:

> [A]ny liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient. It also means other claims that may be contemporaneous to or related to the alleged tort or breach of contract or otherwise provided, all in the context of rendering health care services.

W. Va. Code § 55-7B-2(i). "Health care" is defined as "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to or on behalf of a patient during the patient's medical care, treatment or confinement." *Id.* § 55-7B2(e).

In "flesh[ing] out the boundaries of the [MPLA]," our Court of Appeals has provided an exceptionally detailed examination of the statute's legislative history, structure, and applicable case law. The discussion is worth quoting at length:

> The [MPLA's] legislative history makes clear "the Legislature's intent for the [MPLA] to broadly apply to services encompassing patient care—not just the care itself." [*State ex rel. W. Va. Univ. Hosps., Inc. v. Scott*, 246 W. Va. 184, 193, 866 S.E.2d 350, 359 (2021)]; *see* [*State ex rel. W. Va. Div. of Corr. & Rehab. v. Ferguson*, 248 W. Va. 471, 889 S.E.2d 44, 53 (2023)] (noting that in West Virginia, "in interpreting a statute it is the duty of the court to look to the purpose of the enactment as well as to the language employed" (quoting *Metro. Life Ins. Co. v. Hill*, 115 W. Va. 515, 177 S.E. 188, 188 Syl. Pt. 2 (1934))). This is because the [MPLA] is intended to strike a "balance" between "fairly compensat[ing] patients who have been injured as a result of negligent and incompetent acts by health care providers" and protecting providers from high liability-coverage costs. W. Va. Code § 55-7B-1; *see Ferguson*, 889 S.E.2d at 53 ("The Legislature passed the [MPLA] in an effort to remedy what it perceived as a crisis in mounting lawsuits against professional health care providers and health care facilities that led to difficulty in procuring reasonable liability insurance for the medical community.").
>
> At the same time, "[w]hile the reach of the [Medical Professional Liability Act] may indeed be broad, it is not limitless." *Trivett v. Summers Cnty. Comm'n*, [249 W. Va. 231, 244 n.14], 895 S.E.2d 86, 99 n.14 (2023) (quoting *Thompson*, [248 W. Va. at 366,] 888 S.E.2d at 866 (Wooton, J., dissenting)). In fact, the Supreme Court of Appeals has also emphasized that the [MPLA] "is in derogation of the common law and as such, its provisions must be given narrow construction." *State ex rel. Morgantown Operating Co. v. Gaujot*, 245 W. Va. 415, [427,] 859 S.E.2d 358, 370 (2021).
>
> Two decisions of the Supreme Court of Appeals of West Virginia are particularly relevant for evaluating whether [a plaintiff's] claims are for "medical professional liability" under the [MPLA]: *State ex rel. West Virginia University Hospitals, Inc. v. Scott* and *State ex rel. Charleston Area Medical Center, Inc. v. Thompson*.
>
> . . .
>
> *Scott* established that the statutory definition of "medical professional liability" encompasses two types of claims: "anchor claims" and "ancillary claims." *Scott*, [246 W. Va. at 194,] 866 S.E.2d at 360. According to *Scott*, anchor claims are health care-related claims. *Id.* Ancillary claims are those "that are 'contemporaneous to or related to' the health care claim, but still must be in the overall context of rendering health care services." *Id.* (quoting W. Va. Code § 55-7B-2(i)). A plaintiff can have more than one anchor claim. *E.g., id.* at [188, 195, 866 S.E.2d at] 354, 361 (noting multiple anchor claims, including medical negligence and failure to document).

And an anchor claim is required before an ancillary claim can fall under the Medical Professional Liability Act. *Id.* at [194, 866 S.E.2d at] 360 ("[Y]ou must have the anchor claim (fitting the definition of 'health care') and then make the showing that the ancillary claims are (1) contemporaneous with or related to that anchor claim; and (2) despite being ancillary, are still in the context of rendering health care.").

*Scott* emphasized, however, that anchor "health care" claims were not limited to those directly alleging medically tortious actions (such as medical negligence), but could also include a wide variety of actions, including corporate negligence. In *Scott*, a couple sued a hospital after a nurse introduced air bubbles into their newborn's bloodstream via intravenous equipment, leading to an air embolism that caused the infant serious neurological impairment. *Id.* at [189, 193, 866 S.E.2d at] 355, 359. The couple brought claims not only for medical negligence, but also for corporate negligence. Their corporate-negligence claims were for 1) the decision not to purchase and utilize air filters for the intravenous system; 2) the failure to document the cause of the child's injuries correctly in the discharge summary; 3) spoliation of evidence, specifically, the peripheral line tubing used in the intravenous system; and 4) the failure to report the incident properly to regulators. *Id.* at [189, 866 S.E.2d at] 355; *see id.* at [193–95, 866 S.E.2d at] 359–61. The Supreme Court of Appeals concluded that the [MPLA] applied to all four corporate-negligence claims, with the first two qualifying as anchor claims and the latter two as ancillary claims. *Id.* at [195 866 S.E.2d at] 361.

In concluding that the failure-to-purchase and failure-to-document claims qualified as anchor claims themselves—even though those claims did not directly allege traditional medical-malpractice torts—*Scott* emphasized that those claims nonetheless implicated "medical judgment or skill" and were thus "'health care' claims." *Id.* at [193–94, 866 S.E.2d at] 359–60; *see id.* at [195, 866 S.E.2d at] 361.

. . .

By contrast, *Scott* concluded that the spoliation-of-evidence and failure-to-report claims were "ancillary" because while they did not themselves implicate health care decisions, they were claims "contemporaneous to or related to" the anchor claims that arose "in the context of rendering health care." *Id.* at [197, 866 S.E.2d at] 363 (quoting *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 216 W. Va. 656, 609 S.E.2d 917, 924 (2004)); *see id.* at [195–96, 866 S.E.2d at] 361–62. They consequently also fell under the [MPLA].

*Thompson* provides further guidance regarding the anchor-claim test. There, the plaintiff suffered a stillbirth arising from natural causes. *Thompson*, [248 W. Va. at 355,] 888 S.E.2d at 855. This left the defendant medical center in possession of the fetal remains, which it released to a funeral home by giving the remains to the funeral home's employee to transport in her personal vehicle. *Id.* at [355–56, 888 S.E.2d at] 855–56. The plaintiff sued the medical center, funeral home, and funeral home's employee, asserting against the medical center "claims of negligence,

15

negligent infliction of emotional distress, negligent mishandling of a corpse, and negligent supervision." *Id.* at [360, 888 S.E.2d at] 860; *see id.* at [356, 888 S.E.2d at] 856.

The two questions before the Supreme Court of Appeals were whether the plaintiff's claim involved a "patient" under the [MPLA]—since the claims all arose after the fetus's death—and if so, whether the medical center's "handling of the fetal remains constituted 'health care' within the meaning of the [MPLA]." *Id.* at [357–58, 888 S.E.2d at] 857–58. . . . [T]he Supreme Court of Appeals concluded that the [MPLA] applied because the claims "all arose in the context of the alleged mishandling of the fetal remains as health care services" provided to the plaintiff as a patient in her own right during her hospitalization related to the stillbirth. *Id.* at [360, 888 S.E.2d at] 860; *see id.* at [358–59, 888 S.E.2d at] 858–9.

In so holding, *Thompson* reasoned that the defendant medical center "obtained the fetal remains . . . . as a direct result of providing health care" to the plaintiff, and so the claims arising out of the mishandling of those remains were based on health care services. *Id.* at [359, 888 S.E.2d at] 859. Therefore, it described the "anchor claim" as the "handling of fetal remains as a result of a stillbirth delivery," meaning at minimum the cause of action for negligent mishandling of a corpse qualified as an anchor claim. *Id.* at [361, 888 S.E.2d at] 861. *Thompson* also concluded that, to the extent the plaintiff had asserted a separate violation-of-privacy cause of action, such a claim constituted an ancillary claim that fell under the [MPLA]. *Id.* at [360–61, 888 S.E.2d at] 860–61 (concluding that the [MPLA] "applies to any claim based on the alleged unauthorized disclosure of medical information" because such a claim "would be contemporaneous and related to the anchor claim—handling of fetal remains as a result of a stillbirth delivery").

*Neidig v. Valley Health Sys.*, 90 F.4th 300, 306–08 (4th Cir. 2024) (alterations adopted).

As noted, the MPLA has broad but not limitless application. *See Scott*, 246 W. Va. at 194, 866 S.E.2d at 360 ("It is not a broad stroke application that because a claim is contemporaneous to or related to health care that it falls under the MPLA."). A plaintiff must first "have the anchor claim (fitting the definition of "health care") and then make the showing that the ancillary claims are (1) contemporaneous with or related to that anchor claim; and (2) despite being ancillary, are still in the context of rendering health care." *Id.* Although neither *Scott* nor *Thompson* "clearly delineate which portion of the [MPLA's] definition of 'medical professional liability' refers to anchor claims," *Neidig*, 94 F.4th at 308, the MPLA encompasses only those claims "based

on health care services rendered, or which should have been rendered," or that arise within the "context of rendering health care." W. Va. Code § 55-7B-2(i).

Despite the United States' assertion to the contrary, Plaintiffs do not plead any medically tortious conduct (such as medical negligence) against the United States. Rather, Plaintiffs' claims are premised on the United States' unauthorized disclosure of their mental health records to a third-party law firm in response to the firm's request for Plaintiffs' dental records. [Doc. 6 at 9 ¶¶ 41–43]. None of the claims asserted involve an "act or treatment performed or furnished, or which should have been performed or furnished . . . during the patient's medical care, treatment or confinement." *Id.* § 55-7B2(e). The alleged wrongdoing came, if at all, *after* Plaintiffs' medical care and treatment at BVMAC. Accordingly, Plaintiffs claims are not governed by the MPLA.

Although the MPLA is inapplicable, the Supreme Court of Appeals has, as noted, long recognized the "unauthorized release of a patient's medical records would be a tort cause of action . . . ." *Allen*, 179 W. Va. at 364, 368 S.E.2d at 928; *see also* Syl. pt. 4, *Barber*, 240 W. Va. at 665, 815 S.E.2d at 474. In *Allen*, a doctor, in response to a subpoena issued in a divorce proceeding, released all plaintiff's medical records to her spouse. *See* 179 W. Va. at 362, 368 S.E.2d at 925. The doctor did so "without taking reasonable care to ensure that only those parts of her medical records that a court had found 'relevant' to the divorce proceeding would be made public." *Id.* at 363, 368 S.E.2d at 926. In noting the claim was governed by tort law "even though the duty violated arose from a contract," the Supreme Court of Appeals indicated a plaintiff could only succeed on the claim where there is evidence of "conduct so outrageous as to shock the conscience." *Id.* at 364, 368 S.E.2d at 928 (requiring the heightened showing "because of the likelihood of vexatious litigation in a profession that already has more than its fair share of

lawsuits").

 "Whether conduct may reasonably be considered outrageous is a legal question" for the court to decide. Syl. Pt. 4, *Travis v. Alcon Labs., Inc.*, 202 W. Va. 369, 504 S.E.2d 419 (1998). In determining what constitutes "outrageous conduct," the Supreme Court of Appeals looks at whether the alleged conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Tanner v. Rite Aid of W. Va., Inc.*, 194 W. Va. 643, 650–51, 461 S.E.2d 149, 156–57 (W. Va. 1995) (quoting Restatement (Second) of Torts § 46(1) cmt. d (1965)). Thus, liability may attach only where a "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" *Id.* (internal quotation marks omitted).

 Plaintiffs allege in response to the law firm's request for Plaintiffs' dental records, BVAMC employees used the search term "dental" to identify Plaintiffs' medical records. [*Id.* at 9 ¶¶ 41–43]. BVAMC then released not only Plaintiffs' dental records, but several extraneous records, including sensitive mental health records incidentally containing the search term. [*Id.* at 9 ¶¶ 41–43]. Unlike the doctor in *Allen*, however, BVAMC acted without a court order or subpoena. Further evidentiary development is warranted to determine whether the conduct qualifies as "outrageous."

 Accordingly, the Court **DENIES** the United's States' Motion to Dismiss with respect to Count I.

## B.    *Count II – Retaliation*

 In Count II, Plaintiffs allege BVAMC (1) disclosed their medical records, (2) refused medical and dental care contrary to their benefit entitlement (3) discriminated against them

based on their mental health records, and (4) harassed them by frustrating the treatment plans of their treating physicians. [Doc. 6 at 18 ¶¶ 80, 81]. They assert all the actions were taken in retaliation for their prior tort claims challenging the denial of their benefits.

The Court lacks subject matter jurisdiction over (2) above. The Veterans' Judicial Review Act ("VJRA"), Pub. L. No. 100-687, 102 Stat. 4105 (1988), is a specialized, multi-tiered evaluation process for the adjudication of veterans' benefits claims. It requires the VA Secretary to decide "all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans." 38 U.S.C. § 511(a). Subject to some exceptions not relevant here, *see id.* § 511(b), the Secretary's decisions are "final and conclusive and may not be reviewed by any other official or by any court" beyond the statutorily prescribed appeals process. *Id.* § 511(a). As our Court of Appeals has explained, "federal district courts lack jurisdiction to review VA decisions that 'affect the provision of the benefits awarded by the VA.'" *Hairston v. DVA, Reg'l VA Off. Martinsburg*, 841 F. App'x 565, 569–70 (4th Cir. 2021) (quoting *Butler v. United States*, 702 F.3d 749, 753 (4th Cir. 2012)).

The VJRA, however, does not preclude the Court from making "independent findings of fact and conclusions of law" in FTCA proceedings, so long as the adjudication of the FTCA claim does "not affect the validity of [a plaintiff's] VA benefits awards." *Butler*, 702 F.3d at 755; *see also id.* at 754 ("Congress has established a dual system which handles veterans' benefits and tort claims in distinct and separate manners."); 28 U.S.C. § 1346(b)(1) (providing for district court jurisdiction over FTCA claims).  Thus, to the extent Plaintiffs allege retaliatory acts straying outside the VJRA in (1), (3), and (4) above, which assert discrimination, harassment, and unlawful disclosure of their medical records, further scrutiny is warranted.

The FTCA is an express waiver of sovereign immunity, which permits individuals

to sue the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). It "gives federal district courts exclusive jurisdiction over claims . . . for 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission' of a [United States employee] 'acting within the scope of his office or employment.'" *Millbrook v. United States*, 569 U.S. 50, 52 (2013) (quoting 28 U.S.C. § 1346(b)(1)). Before aggrieved parties may bring such a suit in federal court, however, they must first exhaust their administrative remedies by making an "initial presentation of a claim to the appropriate federal agency within two years of the accrual of the cause of action." *Gould v. U.S. Dep't of Health & Hum. Servs.*, 905 F.2d 738, 741 (4th Cir. 1990) (citing 28 U.S.C. §§ 2401(b), 2675(a)); *see also McNeil v. United States*, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."). A final denial by the appropriate agency is "a jurisdictional prerequisite to suit." *Gould*, 905 F.2d at 741.

A plaintiff may exhaust by filing a "Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident" with the appropriate federal agency. 28 C.F.R. § 14.2(a). The degree to which facts alleged in a prior claim satisfy exhaustion requirements depends upon whether they provide "cause [for] the agency to investigate" the claim. *Ahmed v. United States*, 30 F.3d 514, 517 (4th Cir. 1994). Courts have declined to extend exhaustion to claims under different legal theories arising out of a common set of facts where this notice requirement is not satisfied. *See, e.g.*, *id.* at 517 (determining personal injury claim was not exhausted, even though property damage claim was, because "while the

[Standard Form 95] refers . . . to a potential personal injury claim, one was never made and no sum certain was ever demanded" for it); *Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 721 (7th Cir. 2012) (holding that administrative claim for "battery by the therapist" does not exhaust a claim for "negligence by her supervisors in failing to detect and prevent her sexual battery of him"); *see also Bembenista v. United States*, 866 F.2d 493, 499 (D.C. Cir. 1989) (dismissing a claim for failure to present it to the federal agency because the attachment of documents from which an agency could infer an unstated injury does not qualify as notice).

While Plaintiffs exhausted claim (1) above, namely, the claim BVAMC retaliated against them by unlawfully disclosing their medical records, they did not do so with respect to (3) and (4), namely, their claims of retaliation by discrimination and harassment. Although Plaintiffs make a claim for "retaliation" in their Standard Form 95s and accompanying documents, the only alleged act of retaliation by BVAMC is the unlawful disclosure of Plaintiffs' medical records to the former VA dentist and the law firm. [*Id.*]. Nowhere in the filings they submitted to the VA do Plaintiffs assert claims of retaliation via discrimination or harassment. [*See* Doc. 6 at 18 ¶ 81].

Even in their request for reconsideration, Plaintiffs fail to explain how they believe they were intentionally discriminated against or harassed. [Doc. 11-1 at 119–38]. Nowhere in Plaintiffs' attempt to "clarify and amend [Plaintiffs' Standard Form 95] Basis for Tort Claim" do Plaintiffs list "retaliation," "discrimination," or "harassment" as the bases for their claim. [*Id.* at 119–20]. And while Plaintiffs state generally that they "have been penalized and retaliated against," [*Id.* at 138], such a bare-bones assertion is insufficient to provide the VA notice with respect to any claim based on retaliatory conduct beyond the alleged unlawful disclosure of medical records.

Accordingly, inasmuch as Plaintiffs failed to make the requisite initial presentation

to the VA before instituting this action, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims under (3) and (4) above for retaliation by discrimination and harassment.

C.      *Counts III through VI*

Plaintiffs assert the exhaustion is unnecessary for a private right of action under Title VI of the Civil Rights Act of 1964[5] ("Title VI"), [*see* Doc. 17 at 7–11]. The Amended Complaint makes one fleeting reference to "racial/gender discrimination" when it alleges a "member of the Ethics Committee suggested to [Plaintiffs] that it would be best for them to transfer their care to avoid retaliation, harassment, continued racial/gender discrimination, and open blatant hostility." [Doc. 6 at 11 ¶ 53]. The Amended Complaint make no other reference to Plaintiffs' "race, color or national origin" nor to Title VI itself. Accordingly, the professed claim does not approach the level of plausibility.[6]

Furthermore, Plaintiffs' Standard Form 95s and accompanying documentation omit explicit mention of intentional or negligent infliction of emotional distress, negligent supervision, negligent training, or negligent hiring. [Doc. 11-1 at 2–5, 60–65]. Neither do the filings contain allegations supporting such claims. [*Id.*]. Plaintiffs make one mention of "emotional distress" in their request for reconsideration when describing claims set forth by other plaintiffs in "supporting case law." [Doc. 11-1 at 119–20]. They do not suggest they intend to plead such a claim. [*Id.*].

---

[5] Title VI states, "No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d (1976).

[6] Plaintiffs also appear to assert administrative exhaustion is not required pursuant to an exception to the West Virginia Human Rights Act ("WVHRA"), [*see* Doc. 11 at 11], the purpose of which is to protect West Virginians from unlawful discrimination in employment and places of public accommodation. *See* W. Va. Code § 5-11-2. Again, the Amended Complaint makes no mention of the WVHRA, nor which of its many provisions may be applicable.

Thus, the VA is without sufficient notice as to the claims set forth in Counts III through VI, as they have not yet been presented to the VA for administrative adjudication.

Accordingly, Counts III through VI are **DISMISSED WITHOUT PREJUDICE**.

**IV.**

Based upon the foregoing discussion, the Court **ORDERS** as follows respecting the United States' Motion to Dismiss:

1. The United States' Motion to Dismiss [**Doc. 11**] is **GRANTED IN PART** and

   a. Count II is **DISMISSED** with respect to Plaintiffs' claims they were refused medical and dental care contrary to their benefit entitlement;

   b. Count II is **DISMISSED** with respect to Plaintiffs' claims for retaliation by discrimination and harassment; and

   c. Counts III through VI are **DISMISSED** in their entireties.

   The Clerk is **DIRECTED** to transmit a copy of this written opinion and order to all counsel of record and to any unrepresented party.

ENTER:        June 6, 2024

Frank W. Volk
United States District Judge